# 𝔕𝔦𝔠𝔥𝔪𝔬𝔫𝔡

ROBERT L. JONES AND EVA E. JONES V. WILLARD W. LAMM.

March 10, 1952.

Record No. 3883.

Present, Hudgins, C. J., and Buchanan, Miller, Smith and Whittle, JJ.

The opinion states the case.

*David Nelson Sutton* and *Wm. Earle White,* for the plaintiffs in error.

*Lewis Jones* and *James O. Heflin,* for the defendant in error.

WHITTLE, J., delivered the opinion of the court.

Willard W. Lamm, appellee, sued Robert L. Jones and Eva E. Jones, appellants, for personal injuries alleged to have been sustained while he was working on appellants' farm. Appellee alleged that the injuries were sustained on May 13, 1949, when a board in the floor of a wagon bed broke, causing his right leg to go through the hole, throwing him to the floor, injuring his leg and more seriously injuring his back.

There was a trial of the case before a jury in the Circuit Court of Middlesex county in March, 1950, which resulted in a hung jury. On the second trial, in September, 1950, the case was, by agreement, submitted to the judge for determination. The judgment here complained of in the sum of $3,000 resulted.

There are two assignments of error relied upon. The first charged that the judge considered the testimony of a wit-

ness called at the former trial which was not introduced at the trial under review. A reading of the trial court's written opinion does not bear out this contention, and there is no merit in the assignment.

The second assignment is: "The decision and judgment of the court is contrary to the law and the evidence in this case, and is without evidence to support it, and the court erred in overruling the motion of the defendants to set aside its decision and to enter final judgment for the defendants."

The decision of the judge in this instance has the effect of a jury's verdict and all conflicts in the evidence must be treated as having been resolved in appellee's favor.

The evidence from appellee's standpoint is as follows: Willard W. Lamm, 33 years of age, has been engaged in farming all his life. On or about February 1, 1949, he saw an advertisement in a Petersburg newspaper which read: "Wanted experienced farmer. Good tenant house. Apply Jones' Hatchery, Phone 2857." Lamm answered this advertisement and was employed for appellants by J. H. Southall, their son-in-law. Appellants were engaged in the chicken business and Lamm was the only experienced farmer on the place. Lamm testified:

"Q. But as far as you know you were the only experienced farmer down at the place?

"A. I was hired down there as a farmer.

"Q. And you were the only farmer down there?

"A. That is true."

There was a farm wagon on the place with a body on it. Prior to May 11, 1949, Lamm used this wagon for the purpose of hauling shavings and droppings from the chicken houses. Others on the farm at times had used the wagon. The wagon which was approximately seven years old was of heavy construction. The flooring of the bed was made of 2 inch by 6 inch boards. When not in use it was kept under a shed.

On May 11, 1949, Southall directed Lamm to get the wagon and use it to haul fertilizer to the field where corn was to be planted. Lamm suggested that he should grease the wagon before using it. He said: " * * * I figured that this wagon had not been greased and everything and I wanted to grease it before hauling this fertilizer, because the fertilizer was heavy, and it was a continuous haul, and I wanted to be sure the wagon

was in good shape, * * * I looked at it to the best of my knowledge. The wagon seemed to be all right for use.

"Q. How long had you been using the wagon, or wagons generally?

"A. Ever since I been farming.

"Q. And you were thoroughly familiar with them?

"A. That is right."

The court asked the appellee the following:

"Q. And you did actually inspect the wagon before you used it for hauling fertilizer.

"A. Judge, your Honor, I didn't get up under the wagon and look at it and around on the sides. I just looked over into the body, the body seemed to be in pretty good shape. I would say the wagon was all right to use. I didn't see any holes there, or anything."

After greasing the wagon Lamm loaded it with fertilizer and hauled it to the field. The fertilizer was packaged in 100-lb. paper bags and was loaded in two rows lengthwise along each side of the body, a third row of bags being placed crosswise on top of the two rows in the middle of the wagon bed. The bags along the side could be removed from the ground but the third row necessitated Lamm getting into the wagon in order to unload them.

Very little corn was planted on May 11th due to some mechanical difficulty with the planter. On Thursday, May 12th, Lamm continued planting corn, and on Friday, May 13th, he again loaded the wagon with fertilizer. This load was a light one. The bags were placed along the sides of the wagon but there were only two bags, as he recalled in the middle row, placed crosswise.

Lamm was working alone in the field on Friday, May 13th, the day of the alleged accident. He testified that he had been working about three hours when he mounted the wagon for the purpose of getting a torn bag of fertilizer from the middle row. He picked up the bag and was walking to the rear of the wagon body. When he reached a point about three feet from the rear of the wagon body his right foot and leg broke through the bottom and he was thrown on his back with the bag of fertilizer resting on his chest. His leg went through the hole up to his hip. After a few minutes he got up and went to the house.

That afternoon Lamm went to Deltaville to see a doctor who

treated the abrasions on his leg, and on Saturday he was carried to McGuire's Hospital where an x-ray of the leg was made. The x-ray showed no fracture. Appellee worked on the farm, finished planting corn and in June helped harvest wheat, but his condition grew worse and in July he told Southall that he could not continue the work whereupon Southall got someone else to take his place.

In view of the court's decision, as heretofore stated, we must accept the facts as outlined. It must be resolved that the accident happened as appellee contends, notwithstanding the fact that there is substantial evidence to the contrary. We also must accept the finding that appellee was injured as a result of the accident.

Accepting all this as true, there has not been proven any act or omission on the part of appellants which renders them liable to appellee under the facts of this case. No primary negligence has been shown. We are here dealing with a case which involves the common law duty of a master to his servant. The master does not insure the safety of the servant. The master's duty is to use ordinary care to supply reasonably safe instrumentalities for the use of the servant. The master is not a guarantor of the employee's safety, he is not required, at his peril, to provide the best and safest instrumentalities.

In this case we are dealing with a common farm wagon. They are found in general use on most farms. Appellee admits that he had used them ever since he had been engaged in farming and was thoroughly familiar with them. He was the experienced farmer in this instance, and if there was a defect in the floor of the wagon bed such as would render appellants liable it should have been discovered by appellee who had been using the wagon for several days. If appellee did not discover the defect under the circumstances it would be unreasonable to hold that appellants, through the exercise of ordinary care, should have discovered it.

Appellee contends that the wagon bed was destroyed by appellants after his claim had been placed in the hands of an attorney. The letter from the attorney was dated August 23, 1949. Appellants built a lighter bed to be used in hauling grain. The bed was rebuilt between the 10th and 15th of October, 1949. Evidently there was no rush in "destroying" the old bed. Assuming that appellee's suspicion is correct, the

destruction of this evidence would have been reprehensible but it would not be proof of primary negligence. We are assuming that the accident occurred as outlined by appellee.

Appellee relies upon the case of *Colonna Shipyard, Inc.* v. *Bland,* 150 Va. 349, 143 S. E. 729, 59 A. L. R. 497. He argues: "Bland was a ship carpenter and was required to go into the hold of a ship to make repairs and was instructed to use a moveable ladder 14 or 15 feet long to go down into the hold of the ship. The ladder broke and Bland was injured. * * * '' We held in that case:

"We have no intention * * * of impinging in the slightest degree upon the 'simple tool' doctrine, or the line of cases in which employees having control of and using movable ladders were denied the right to recover. This ladder, while moveable within the hatchway, was in no sense an appliance entrusted to the plaintiff here for his use in connection with his work. He had not constructed it, it was not in his custody, it was accessible to others * * *. It was like a stairway, merely his means of access to his work in the hold of the ship, which his employer directed him to use, and this direction imposed upon the employer the duty to exercise reasonable care to see that it was a reasonably safe means of access." (150 Va. at page 363).

Appellee cites another ladder case, *Missouri Pacific R. Co.* v. *Spangler,* 140 F. (2d) 917, where an employee was injured in descending a stationary ladder into a pit in a pumphouse when a rotten piece of the ladder broke. In that case it was held that the ladder was a part of the place of employment and as such was subject to the general duty of the master to provide the servant with a reasonably safe place to work.

The facts and circumstances in the cases cited by appellee are vastly different from the instant case. Here we are dealing with an experienced farmer who, after greasing and examining the simple farm wagon, found that "the wagon seemed to be all right for use". If there were no defects in the floor of the wagon bed visible to appellee, then in the exercise of ordinary care the defects were not visible to appellants.

"Where the tool is simple in construction, so that defects therein can be discovered without special skill or knowledge and without intricate inspection, the employee is as well qualified as anyone else to detect defects and to judge of the probable danger of using the device while defective; and where the tool

is in the possession of the employee, his opportunity for inspection is better than that of the employer." 35 Am. Jur., Master and Servant, § 143, page 574.

■ "An employer is under no obligation to his servants to inspect during their use those common tools and appliances with which every one is familiar. * * * " 56 C. J. S., Master and Servant, § 235, page 990.

■ "The test resorted to is what a reasonably prudent person would ordinarily have done in the same situation or under similar circumstances. Although the employer's duty is that of exercising ordinary or reasonable care, whether the work is comparatively safe or is extremely dangerous, his duty becomes more imperative as the risk increases, as do the acts and precautions required by ordinary prudence." 56 C. J. S., Master and Servant, § 202, page 907.

The course of conduct followed by appellants here is the usual and customary procedure ordinarily exercised by prudent men under similar circumstances and thus affords the measure of the degree of care required of the employer which in this instance is ordinary care. *Reynolds* v. *Security Trust* Co., 246 Mich. 670, 225 N. W. 575.

There is no showing of the lack of ordinary care by the appellants in this case, and for this reason the judgment is set aside and annulled and final judgment is here entered for appellants.

*Reversed and final judgment.*